839 So.2d 141 (2003)
Kim MICELI
v.
Barbara Olivard Riso, Wife of/and Salvadore RISO, and
State Farm Insurance Company.
No. 02-CA-810.
Court of Appeal of Louisiana, Fifth Circuit.
January 14, 2003.
Writ Denied May 2, 2003.
*142 Christopher T. Grace, Jr., Metairie, LA, for Plaintiff-Appellant, Kim Miceli.
Warren G. Deagano, Jr., New Orleans, LA, for Defendants-Appellees, Barbara Olivard Riso, Wife of/and Salvadore Riso.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
This is a suit by a son against his mother and stepfather, seeking recovery of $200,000 in currency belonging to him that he was storing in their safe. The son appeals the trial court's rejection of his claims. We affirm.
On May 10, 1996 Kim Miceli filed suit against Barbara Olivard Riso, wife of/and Salvadore "Sam" Riso.[1] In his petition he alleged that since approximately 1985 he had left certain valuables with the defendants for safekeeping in their Metairie home. The valuables included a large amount of U.S. currency. In September 1995, the plaintiff discovered that most of the currency was missing. According to the plaintiff, he had $210,000, but he found only $10,000 in his bank bag in the defendants' safe. None of the defendants' money kept in the safe was missing, nor was anything else in their house missing.
The plaintiff alleged that the defendants were acting as depositaries of his property and, as such, they were obligated to preserve his property and to return it to him on demand. He asserted that the defendants failed to use due diligence in preserving the deposit placed with them for safekeeping. He alleged they were negligent in preserving his property, failed to take proper safeguards to prevent access to the safe by third parties, and failed to use reasonable means to safeguard his property. He stated that his requests to the defendants for return of the missing $200,000.00 have been refused.
Alternatively, the plaintiff alleged that defendant Barbara Riso intentionally removed his cash from her safe and converted it to her own use, using it for the benefit of the community of acquets and gains between her and her husband. The plaintiff alleged that the defendants and their insurer were liable to him for loss of his property, loss of use of his property, and for mental anguish and emotional distress he suffered over the loss of his property.
The defendants denied they either stole or conspired to steal from the plaintiff. They admitted that he had asked to put *143 money in their safe, but alleged they did not see the amount he put in or whether it was all money. They asserted that he had a key to the house and access to the safe. They stated that Mrs. Riso paged the plaintiff one day and that he came over, went into the safe, and claimed to her that $200,000 was in the safe.
According to the defendants' answer, on the occasion the plaintiff allegedly discovered there was money missing, Mrs. Riso had gone into the safe and noticed that the bag in which he allegedly kept money looked empty, whereupon she called the plaintiff and asked him to come over to look at the contents. They alleged he immediately claimed that she had taken his money. Regarding the plaintiff's claim that they are liable as depositaries, the defendants pleaded lack of consideration as an affirmative defense.
The defendants then assumed the position of plaintiffs in reconvention, seeking recovery of their attorneys' fees and costs for defending in these proceedings. They asserted that the plaintiff maliciously made slanderous accusations against them, causing them great mental and emotional distress. They sought damages for embarrassment, humiliation, and loss of reputation due to the malicious and slanderous remarks and actions by the plaintiff, as well as damages for the intentional infliction of emotional distress due to the plaintiff's continuous threats and assaults.
The case underwent two days of trial without a jury and the court took it under advisement. Subsequently the court rendered judgment in favor of the defendants and against the plaintiff, dismissing his claims with prejudice. In addition, the judgment dismissed the defendants' reconventional demand. In written reasons for judgment, the court stated, in pertinent part:
The Court finds Mr. Miceli to be a credible witness and believes that his money was stolen. The Court further believes that it is a possibility that Ms. Riso played a part in the disappearance of the money. However, Mr. Miceli has the burden of proving by a preponderance of the evidence that Ms. Riso took the money. A mere possibility that Ms. Riso was involved in the disappearance of the money is not sufficient.
The plaintiff's motion for new trial was denied. In denying the motion for new trial, the trial court stated:
There was little, if any, direct proof of anything or direct evidence of anything.
There was a lot of circumstantial-type evidence, a lot of innuendo and so on. I believe that Mr. Miceli had some money in there. Whether it was exactly $200,000, you know, I don't know, but I thought he was a credible witness.
But, beyond that, we're faced with a situation where a number of people had been in the house. We had workmen who were in the house. We had other individuals who had been in the house. The sister of the plaintiff had been in the house.
There was no proof that the money had been taken by Mrs. Riso.
Miceli has appealed. The Risos did not appeal the dismissal of their reconventional demand.
On appeal the plaintiff contends the district court erred in finding he did not meet his burden of proving by a preponderance of the evidence that Mrs. Riso took the money, because the burden of proof rests on Mrs. Riso to exonerate herself from liability by proving as an affirmative defense that she acted as a prudent administrator in safeguarding the deposited property.

*144 FACTS
At trial the parties' testimony tracked the factual allegations in their pleadings. Kim Miceli testified he first began keeping currency in the safe at his parents' home between 1982 and 1984. The money was in bundles of $10,000, in $50 and $100 denominations, all the bundles stacked together with rubber bands around the entire stack. He kept the stack inside a cloth bank bag, which was placed inside a large manila envelope.
He began keeping a log of his withdrawals from the cash cache in 1990, at his mother's suggestion. The last entry on the log shows a balance of $210,000 on March 26, 1992. He testified he did not remove any money from the safe again until September 1995.
The plaintiff testified he had once had a key to his mother's house, but he returned the key to her in 1988 or 1989. He said he had no key to her house in 1995. He also said he did not know where the combination to the safe was kept, nor did he ever open the safe, nor did he ever see anyone but his mother open the safe.
In July 1995, while the plaintiff was shopping at Home Depot with Mr. Riso, Mrs. Riso paged the plaintiff. When he phoned her in response to the page, she told him, "Your money looks funny in the safe." He and Mr. Riso left immediately and drove to the Risos' home. When they arrived the plaintiff took out the money and took the stack apart. He did not count the contents of each bundle, but all the bundles were there. He told the defendants that it looked like it was all there.
On September 18, 1995 the plaintiff was at work when his mother called and asked if he had taken any of his money out of her safe. He told her no and she said, "The bag looks funny." He didn't think anything of it because of what had happened in July, but he told her to go check the bag. Shortly afterward she came back and told him, "Your money is gone, your money is gone."
He immediately drove to her house. When he arrived she told him there was still $10,000 left in the bag. She told him, "Oh, the maid must have took the money," and began telling him stories about the maid. She also said, "They must know you're good with money, because they left you $10,000. You can turn that $10,000 back into $200,000." She also told him, "I think I can get your money back. I don't know about all of it, but Mama thinks she can get some of your money back."
The plaintiff began to suspect his mother had taken the money. He noted that both his sister and his mother had thousands of dollars of currency in the safe, as well as jewelry, but none of their money or jewelry was missing. When his sister arrived he asked her to check and see if her money was still there; she did and said it was all there. He and Mr. Riso went outside and the plaintiff told Mr. Riso he thought his mother took the money.
The plaintiff checked the house on the day of the incident, but found nothing to indicate anyone could have broken into the house. He hired a private investigator, who questioned everyone who had access to the Risos' home during that period. Everyone was fingerprinted and the safe and the bank bag also were dusted for prints.
The plaintiff denied the defense's accusation that he took his own money.
The plaintiff stated he did not keep a list of his transactions with the money in the safe until he started making withdrawals. He made deposits to his bag in the safe from 10 to 100 times before he started withdrawing money from it. He said his mother saw him deposit money in there, but he never asked her to initial when he *145 made a deposit, because regardless of how she treated him she was still his mother.
The plaintiff admitted that he did not call the police about the missing money and denied that his parents and his sister wanted to call the police.
The plaintiff's half-sister, Lisa Hunt, testified that in September 1995 she had a key to her mother's house and also had the combination for the safe. She kept some papers and several thousand dollars in currency in the safe. She had never opened the safe herself and had to get her mother to open it; although she once tried to open it, she was unable to do so. Hunt had never seen anyone except her mother open it. Her mother left a sheet of paper containing the combination at her house so Hunt could have access to it.
Hunt testified she had seen no evidence of her mother taking any money from her brother. She had seen nothing in her parents' house or other purchases to make her think they had a large sum of money. According to Hunt, she and her parents wanted to call the police about the missing money, but her brother refused to do so.
Latonya Joseph, who worked as a housekeeper for the defendants in 1995, testified she was not aware the defendants had a safe in the den closet and she did not know where the combination for the safe was. She was aware there was an investigation about some missing money and she cooperated with it. As far as she knew, she was never accused of taking any money.
Barbara Riso, when asked whether her son had a large sum of money in the safe in her den closet, testified, "I saw a package." She said she never asked him how much money was in the package and she never saw him count the money. She did not recall paging her son in July 1995 while he was shopping at Home Depot. She "very vaguely" recalled her husband and her son coming to her home in response to a call from her about the bag in the safe looking funny. She said she had "never, ever seen any money.... Package. Package." She denied ever discussing with her son how much money was in the bag.
She testified she has opened the safe for the plaintiff many times, but denied ever seeing him put money in it or seeing him open the safe himself. She admitted she had not seen anyone other than herself open the safe successfully.
She recalled calling the plaintiff at his shop on the morning of September 18, 1995 regarding the purchase of some certificates of deposit. She had gone into the safe because her husband was going to the bank that morning. She noticed the bag looked flat.
When she told her son, he started "hollering and screaming," which she claimed made her so nervous she was unable to recall what else was said. She testified that when she noticed it was flat, she took it out of the safe and shook it on the floor. A $10,000 pack fell out. She knew how much it was because there was a band around it that had "$10,000" written on it. She left it there in front of the safe and went immediately to the phone and called her son.
Mrs. Riso denied she told her son, "The bag looks funny" and stated that she told him, "The bag looks flat." She denied that he then told her to see how much money was in the bag and denied telling him over the phone, "There's only $10,000 left," because he hung up the phone. She said the plaintiff came over immediately, looked in the bag himself, and told her there was $200,000 missing. She denied that he had told her two months previously that there was $210,000 in the bag.
*146 She was unable to recall how much money she had in the safe at that time. She estimated her daughter had approximately $11,000 in the safe, which she knew it was "just stuck in an envelope, exposed."
Mrs. Riso testified she had $8,000 to $10,000 worth of jewelry in the house, but it was not in the safe. Her money and jewelry, as well as Hunt's money, were still in the safe and house after the plaintiff's money was taken.
She thought that her son had a key to her house in September 1995. She was sure he had the combination to the safe, because she gave it to him long ago.
On cross examination she admitted that during her deposition she had invoked the Fifth Amendment repeatedly, but stated it was on advice of her lawyer. She said that she did not understand what it meant at the time. She admitted that at the time of trial she was aware of what invoking the Fifth Amendment privilege means, but reiterated she did not know it at the time of her deposition.
She did not recall telling her son that maybe the person who took the money left $10,000 in the bag because they knew he was smart about money and could take it and turn it into $200,000. Asked about her alleged statement to the plaintiff that "Mama can get back some of your money," she says what she told him was that she would give him "Lancelot," a rental property that she and her husband owned located on Lancelot Street. She meant he could draw rent from it. She testified that if she said "Mama can get back some of your money," that was pertained to the property on Lancelot Street.
Mrs. Riso testified that she and her husband wanted the police to be called, but her son did not want the police called. She denied taking any money or belongings of her son out of the safe.
Salvadore "Sam" Riso testified he never opened the safe in question because he had another safe in the house in which he kept papers and some cash. He thought both his son and his daughter had keys to the house. The maid did not have a key and he had no reason to suspect her of stealing anything. He said he was never around when the plaintiff or Hunt went into the safe. He himself tried to open it once, but was unable to get it open.
He described the incident at Home Depot his wife paged the plaintiff while they were shopping. As they drove back home, the plaintiff told him he had $210,000 in the safe. Mr. Riso never saw the money himself, but was going by what the plaintiff told him.
Mr. Riso said when they got home the plaintiff went to the safe in the closet. Mr. Riso denied seeing the plaintiff counting money, but said the plaintiff came out and told him his money was there.
Mr. Riso testified it did not look like anyone had broken into the house. He stated that no one has ever admitted to him taking the money. Mr. Riso denied that he ever took any money or anything belonging to his son. He also stated that, to his knowledge, neither did his wife.
According to Mr. Riso, they all wanted to call the police, but the plaintiff didn't want the police called. He wanted to get a private investigator.
Jeffrey Deris testified he was the private investigator hired by Kim Miceli to investigate the money missing from the Risos' safe. The plaintiff originally did not indicate any suspicions he had regarding the culprit.
Deris met the plaintiff at the residence on September 20 and they conducted a crime scene investigation. Deris hired the Jefferson Parish Sheriff's Office crime lab *147 technician, Merril Boling, to assist in the investigation.
Deris testified they found no signs of forced entry or signs of ransacking or searching by burglars. Mrs. Riso opened the safe for them; inside it he saw numerous papers, some cash, some diamonds, and some other items. There was $19,000 that belonged to Mrs. Riso; $11,000 that belonged to her daughter, Lisa; and $10,000 in a Whitney bag that belonged to Mr. Miceli.
Deris took some items from the safe to be fingerprinted by Boling and also the sheet of paper that had the combination to the safe. He interviewed Kim Miceli; Barbara Riso; Sam Riso; Lisa Hunt; Lisa's daughter, Jennifer Hunt; several construction workers; and Latonya Henderson, the maid.
Deris said his interview with the plaintiff involved the plaintiff discussing the investigation from start to finish and how long ago he put money in the safe. He showed Deris a log of money he kept in safe.
Deris testified that in his initial contact on September 20, 1995, Mrs. Riso handed Boling a white piece of paper containing a combination to the safe. She stated several times, "I can't believe Nookie took the money."[2] On September 25 he again interviewed Mrs. Riso and asked her several questions. He asked what was contained in the safe and she went over it, mentioning various items, important papers, and specific amounts of money. She told him that all of her currency and jewelry were still present after the incident of September 18th. She did an inventory and none of her belongings or her daughter's cash was missing.
Regarding the safe combination, Deris noted that in the first interview he asked who had the combination. She stated that she, her husband, and her daughter, Lisa, all have it. Later she indicated that her maid also had the combination to the safe briefly, but subsequently she stated that the maid never had the combination to the safe. She stated that the combination was in her purse and that half the time it was hanging out, with the sheet of paper partially protruding.
According to Deris, Mrs. Riso showed great hostility toward her son, making statements that she wanted to punch him in the face and claw his face, that she hated him; that throughout their life, they had many conflicts and they could not get along.
She told him she was present in the residence when there was construction going on and that the workers did not have access to that area. She also said she knew everybody that was inside the residence.
On October 26, 1995 Deris spoke to Mrs. Riso a third time. She then indicated she had lied to him and changed her story again. She said she did not have the combination to the safe in her purse, but that she had left the combination on top of some shoeboxes next to the safe in the closet, where it had remained for three months. She indicated the reason she lied was because she thought her son would be angry with her for being so careless.
Deris said that Mrs. Riso indicated he should look at her family members for suspects.
Deris admitted that he had not fingerprinted the plaintiff's log sheet of deposits and withdrawals from the currency stash because it was in the plaintiff's possession and the plaintiff did not want to turn it over to Deris. Deris admitted that, had he been investigating the scene for the police, *148 he would not have allowed the plaintiff to keep the log paper.
Deris admitted he did not mention in his report the information about the plaintiff's former access to the house via key. He also admitted that he did not take the plaintiff's fingerprints for comparison to any of the evidence, nor did he question the plaintiff's statement that he did not know the combination to the safe because Mr. Riso had said his daughter had a key to the house, but did not indicate that anyone else had a key.
Merril Boling, commander of the latent fingerprint division of the Jefferson Parish Sheriff's Office, testified that at Deris' request he processed the Riso residence for fingerprints. He also conducted a general investigation of the scene, but saw no sign of forced entry on the house or on either of the safes in the house.
Boling noted that he was surprised when he arrived to find nothing out of place, nothing torn off the walls, nothing ransacked, which he said is very unusual for burglary crime scene. Inside the safe everything was well-wrapped, but he was told there was a considerable sum of money in different stacks and jewelry still in the safe. He saw some of the jewelry and removed some of the money so it could be process for the possibility of fingerprints, as well as the money bands from some of the money to process also.
He also had two slides of prints lifted from the face of the safe, but there were no useable prints. The only identifiable prints were from the paper with the safe combination on it, which were Mrs. Riso's prints. They found no useable prints on the outside of the safe.
He testified that, even with gloves, he would expect to find smeared prints on the safe because of the physical activity a robber would have had to do to punch the safe, mechanically force it open, or try to get the safe off the ground. He said people commonly leave prints when they take something that is not theirs.
Annie Parker, a former housekeeper for the Risos, testified that while she was working for them, she saw the plaintiff come into the house when the defendants were not there. She said, that when the plaintiff came to the house to pick up his mail, he entered through the front door. Parker assumed the door was locked, because Mrs. Riso would tell her before she left that she was going to lock the front door and that Parker should exit by the side door.
There was testimony regarding a loan of $15,000 that the plaintiff had made to the defendants some years earlier for a new car. Mrs. Riso admitted that when her husband gave her the money to give to the plaintiff to repay the loan, she didn't give it directly to him, but just placed it on a shelf in the safe. She admitted she allowed her husband to believe that she had given it directly to the plaintiff.

ANALYSIS
As noted above, the trial court concluded that the plaintiff was a credible witness and that his money was stolen. The court believed there was a possibility that Mrs. Riso "played a part in the disappearance of the money," but found that the plaintiff failed to carry his burden of proving by a preponderance of the evidence that she took it. That is a factual finding, based on credibility determinations, and we discern no manifest error that would justify our reversing it on that ground. See Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979).
As plaintiff points out, the court failed to address the defendants' liability as depositaries. The trial court's silence *149 on this issue is an implied rejection of this theory of recovery.
A deposit is an act by which a person receives the property of another, binding himself to preserve it and return it in kind. La.C.C. art. 2926. A voluntary deposit takes place by the mutual consent of the person making the deposit and the person receiving it. La.C.C. art. 2932.
Consent is implied when the owner has carried or sent the thing to the depositary, and the latter knowing that the thing had been sent, has not refused to receive it. La.C.C. art. 2933. "However, for the delivery of the object to another to constitute a deposit, there must also be mutual intent, expressed or implied, ... that by the act of accepting it the person who receives it has bound himself to safeguard it. Article 2926." Coe Oil Service, Inc. v. Hair, 283 So.2d 734, 738 (La.1973).
The depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property. La.C.C. art. 2937. Although the depositary may not have intended to assume the obligations imposed by law on a depositary, it is the intent to establish the relationship that is determinative. Harper v. Brown & Root, Inc., 391 So.2d 1170, 1173 n. 5 (La.1980).
Once the depositor establishes the existence of a deposit and the loss of the property while deposited, it is presumed that the loss resulted from the depositary's lack of care, and the depositary has the burden to exonerate himself from fault. Harper, 391 So.2d at 1173. A depositary is not an insurer of the property, however, and is not required to guard against every conceivable unlawful act that may be committed against the deposit. Wong v. East Baton Rouge Parish Sheriff's Office, 522 So.2d 1134, 1138 (La.App. 1 Cir.1988), writ denied, 523 So.2d 863 (La. 1988).
We conclude that plaintiff failed to prove that there was a contract of deposit, because the evidence does not prove that defendants, by allowing plaintiff to place his package of money in their safe, intended to bind themselves to safeguard it. See Coe, supra. Further, even if there was a contract of deposit, plaintiff did not prove that defendants were negligent, for they used the same care toward his property as toward their own.
We distinguish Aetna Life and Casualty v. O'Brien, 440 So.2d 966, 969 (La. App. 3 Cir.1983), cited by plaintiff. In that case the depositary left the object of the deposit, a briefcase, in his car and it was stolen. Here, however, plaintiff placed his own bag in defendants' safe and there is no showing that defendants ever touched his bag, except on the occasion when he asked his mother to look inside the bag.
Accordingly, we find no error in the trial court's determination that plaintiff failed to prove his case by a preponderance of the evidence.
Finally, we note that the defendants reassert in their brief their reconventional demand for damages against the plaintiff. However, the defendants neither appealed the trial court's dismissal of their claim, nor did they answer the appeal.[3] Accordingly, we cannot consider their *150 claim and we have omitted discussion of the evidence they presented regarding their damages.

DECREE
For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.
NOTES
[1] Plaintiff also sued defendants homeowners insurance carrier, State Farm Fire and Casualty Company (misnamed as State Farm Insurance Company in the petition). State Farm raised a coverage defense and sought dismissal by motion for summary judgment. Miceli voluntarily dismissed State Farm from the case, reserving his rights against the remaining parties.
[2] Nookie was a nickname for the housekeeper.
[3] La.C.C.P. art. 2133 requires that an appellee seeking relief from the judgment file an answer to the appeal. "A brief submitted by appellee does not satisfy the article requirements as it is neither an answer nor an appeal.... Consequently, as appellee failed to file an answer or perfect an appeal, we are precluded from addressing the issues raised solely in appellee's brief." Arrow Fence Company, Inc. v. DeFrancesch, 466 So.2d 631, 633 (La.App. 5 Cir.1985), writ denied 468 So.2d 575 (La.1985).